# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4669 | **DATE** | 5/9/2001 |
| **CASE TITLE** | Columbus Graham, Jr. vs. Larry G. Massanari | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order. Plaintiff's motion for summary judgment is granted insofar as it request to remand and is denied insofar as it requests reversal of the ALJ's decision. Defendant's cross motion for summary judgment is denied. The cause is remanded to the Commissioner of Social Security for further proceedings consistent with this opinion. Judgment is entered pursuant to Rule 58 F.R.C.P.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAY 16 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | 31 |
| | Mail AO 450 form. | | 5/9/2001 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| SM | courtroom deputy's initials | CD-7 FILED FOR DOCKETING 01 MAY 15 AM 9: 26 | SM mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

|  |  |  |
|---|---|---|
| COLUMBUS GRAHAM, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 00 C 4669 |
| | ) | |
| LARRY G. MASSANARI, | ) | Magistrate Judge Ian H. Levin |
| Acting Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

DOCKETED

MAY 1 6 2001

Plaintiff Columbus Graham, Jr. ("Plaintiff") brings this action pursuant to 42 U.S.C. §

405(g) to review a final decision of the Commissioner (the "Commissioner") of the Social

Security Administration denying his application for Disability Insurance Benefits under the

Social Security Act. For the reasons set forth below, the court remands the cause for proceedings

consistent with this opinion.

## PROCEDURAL HISTORY

Plaintiff initially applied for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") benefits on March 23, 1993, stating that he was disabled since January

1, 1990. (R. 108-10, 133.)[1] On July 19, 1993, Plaintiff's application for DIB was denied. (R.

111-14.) Plaintiff requested reconsideration and on August 27, 1993, he was notified that his

request for DIB benefits had, again, been denied. (R. 116-18.) To be entitled to receive DIB,

---

[1]References are to the certified administrative record prepared by the Commissioner and
filed with this court pursuant to 42 U.S.C. § 405(g).

Plaintiff had to be disabled on or before September 30, 1991, the date his insured status expired. (R. 124.) Plaintiff was, however, found to be disabled for purposes of SSI. (R. 26, 38, 387-88.)

Because Plaintiff's DIB applications had been denied, he requested a *de novo* hearing before an Administrative Law Judge ("ALJ"). (R. 111, 116, 119.) On July 13, 1995, Plaintiff appeared at an administrative hearing before an ALJ. (R. at i.)[2] On December 29, 1996, Plaintiff appeared with counsel at an administrative hearing before ALJ Gilbert Drucker. (R. 24.) The ALJ continued the hearing because he needed the testimony of a Medical Expert ("ME"). (R. 37-40.) On June 23, 1998, Plaintiff and counsel appeared at a supplemental hearing before ALJ Drucker. (R. 43.) Both a ME and Vocational Expert ("VE") testified at the hearing. (R. 59, 66, 396, 400).

On July 16, 1993, ALJ Drucker determined that, as of September 30, 1991, Plaintiff was not disabled. (R. 21-22a.) Plaintiff, subsequently, requested that the Appeals Council review the ALJ's decision. (R. 407-09.) On June 30, 2000, the Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner. (R. 6, 405, 407.) Plaintiff now seeks judicial review of the Commissioner's final decision.

## LEGAL STANDARDS

### I.     STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited. The Social Security Act at 42 U.S.C. § 405(g) establishes that the Commissioner's findings as to any fact are conclusive if they are supported by substantial evidence. *See also Brewer v. Chater*, 103 F.3d 1384, 1390

---

[2]The transcript of this hearing was not included in the administrative record filed by the Commissioner. (R. at i.)

(7th Cir. 1997). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Brewer*, 103 F.3d at 1390. The court may not reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *See Brewer*, 103 F.3d at 1390. Conclusions of law, however, are not entitled to deference, however. Thus, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *See Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## II.    STATUTORY AND REGULATORY FRAMEWORK

To receive disability benefits, a SSI or DIB claimant must be "disabled" as defined by the Social Security Act. *See* 42 U.S.C.§ 423(a)(1)(D); 42 U.S.C. § 1382(a); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993). An individual is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). *See also Jones v. Shalala*, 10 F.3d 522, 523-24 (7th Cir. 1993). To satisfy this definition, an individual must have a severe impairment that renders him unable to do his previous work or any other substantial gainful activity that exists in the national economy. *See* 20 C.F.R. § 404.1505(a).

The Social Security regulations delineate a five-step process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity."

20 C.F.R. § 404.1520(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. Pt. 404, Subpt. P, App.1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *See Brewer*, 103 F.3d at 1391.

If the impairment does not so limit the claimant's remaining capabilities, the fourth step is that the ALJ reviews the claimant's "residual functional capacity ("RFC") and the physical and mental demands of his past work. RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). *See also* Social Security Ruling 96-8p (1996). If the claimant can perform his past relevant work, he will be found not disabled. *See* 20 C.F.R. § 404.1520(e).

For the fifth step, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant -- in light of his age, education, job experience and functional capacity to work -- is capable of performing other work and that such work exists in the national economy. *See* 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f). *See also Brewer*, 103 F.3d at 1391.

## BACKGROUND FACTS

## I. PLAINTIFF'S TESTIMONY

Plaintiff was born on February 19, 1942 and was forty-nine years old on September 30,

1991, the date his insured status expired. (R. 22a, 124.)

Plaintiff testified that he had completed about eight years of education. (R. 48.) Plaintiff stated that he never attended high school. (R. 49.) Plaintiff testified that he could not read Social Security forms and that he could only read a few words from the newspaper. (R. 70.) Plaintiff, however, did tell an individual who filled out his Social Security form that he had completed the tenth grade. (R. 137.)

From 1972 through 1982, Plaintiff worked at International Harvester as an engine tester. (R. 49, 127-28.) In that job, Plaintiff was responsible for testing and repairing diesel engines. (R. 49.) At times, he was required to lift more than fifty pounds. (R. 50.) In addition, from approximately 1984 through 1987, Plaintiff worked at a bakery. (R. 53, 137, 323.) At the bakery, he operated a bag sealing machine (R. 54-56), drove a forklift, (R. 53, 59) and did general cleanup. (R. 58.) He was also required to do heavy lifting. (R. 55, 129, 326.)

## II. MEDICAL EVIDENCE

Plaintiff testified that he had not been hospitalized between the time he stopped working in 1987 and September, 1991. (R. 66.) Plaintiff testified that he waited until February, 1992 before he sought treatment because he did not have medical insurance coverage and that he did not know where to go to receive treatment for his condition. (R. 66, 71.) Plaintiff, however, stated that he had experienced dizziness since 1987. (R. 73.)

On February 4, 1992, Plaintiff reported dizziness to treating physician Dr. Eduardo Solver. (T. 342-43, 403.)

From February 16, 1993 through February 18, 1993, Plaintiff was hospitalized at Loretto Hospital for evaluation of his dizziness and numbness in his left arm. (R. 149.) Plaintiff

underwent a CT scan of his brain. (R. 151.)

On February 16, 1993, Dr. A. Kuruvilla diagnosed Plaintiff with a brain lesion. (R. 151.) In his discharge diagnosis, Dr. V. Yu, diagnosed Plaintiff with dizziness (most likely secondary to peripheral vestibulopathy), and near syncope. (R. 149.) The discharge diagnosis also indicated that a brain lesion after an artifact should be ruled out. (*Id.*) Plaintiff was referred to the University of Illinois for a second opinion. (R. 152.)

On March 2, 1993, Plaintiff was evaluated at the Neuro-Ophthalmology Clinic of the University of Illinois Hospital. (R. 210.) At that time, Plaintiff reported that he had been light-headed for about five years. (*Id.*) After completion of Plaintiff's physical examination, an MRI was ordered for further diagnosis. (R. 211.)

On March 9, 1993, Plaintiff was evaluated at Loretto Hospital for slight dizziness. (R. 157.)

On March 17, 1993, an MRI of Plaintiff's brain showed a lesion "most consistent with a cavernous hemangioma."[3] (R. 195.)

On March 24, 1993, Plaintiff's lumbosacral spine x-rays showed that he had diffuse disk space narrowing, most marked at L3-L4, L4-L5 and L5-S1. (R. 196.) Additionally, it was noted that there was sclerosis of the facet joints of Plaintiff's lower lumbar spine. (*Id.*)

On March 29, 1993, Plaintiff received further diagnostic testing where he reported that he had dizziness for seven years with each episode of dizziness lasting several minutes. (R. 204.)

---

[3]A cavernous hemangioma is a "vascular tumor preponderantly composed of large dilated blood vessels, often containing large amounts of blood, . . . also in many viscera, particularly the liver, spleen, pancreas and sometimes the brain." W.B. Saunders Co., *Dorland's Illustrated Medical Dictionary* (28th ed. 1994), p. 741.

On March 30, 1993, an MRI of the Plaintiff's lumbar spine showed moderate degenerative changes. (R. 197.)

On April 6, 1993, Plaintiff was, again, evaluated at the Neuro-Ophthalmology Clinic at the University of Illinois Hospital. (R. 206.) He reported that he had dizziness two to three times per week and, in some cases, he experienced dizziness everyday. (*Id.*)

On April 14, 1993, Dr. Fady Charbel of the University of Illinois told Plaintiff that he had a "lesion in his upper vermis, [that was] slightly eccentric to the left, which most likely is a cavernous hemangioma that has bled." (R. 194.) Moreover, Dr. Charbel reported that "[g]oing back into history it seems that he's had two episodes of bleeding . . . " (*Id.*.) Dr. Charbel recommended that Plaintiff undergo surgery. (*Id.*)

From May 3, 1993 through May 11, 1993, Plaintiff was hospitalized for brain surgery. (R. 212.) On May 4, 1993, surgeons removed Plaintiff's cavernous hemangioma. (R. 217.)

On June 19, 1993, Dr. Ghanim Kassir performed a consultative internal medical evaluation for Plaintiff's disability claim. (R. 225.) Plaintiff told Dr. Kassir that he had dizzy spells for about five years. (*Id.*) Plaintiff's "dizzy spells occur daily and some are severe in type leading to a loss of balance. During most of these dizzy spells he has a spinning sensation which resulted in the instability of his gait." (*Id.*)

Plaintiff told Dr. Kassir that he had low back pain for nine years. (R. 225.) He stated that he had pain when sitting, standing or walking. (*Id.*) Dr. Kassir performed a straight leg raising test which was positive bilaterally with severe pain. (R. 226.) Plaintiff, however, did not perform the range of motion testing because he feared he would fall down. (*Id.*) Dr. Kassir noted:

His gait is ataxic in type with a staggering or swaying of the trunk from side to side. He is unable to walk for a distance of 50 feet without the support of his cane. Tandem walking could not be performed by him because of his instability, and swaying of the trunk from side to side. (R. 227.)

Dr. Kassir's evaluation further indicated that Plaintiff's Romberg's test[4] was positive. (R. 227.) For instance, Plaintiff could not perform all aspects of the mental status examination. (*Id.*) Dr. Kassir also diagnosed dizziness, vertigo, bilateral ataxia, impairment of balance, and bilateral lumbar radiculopathy due to severe degenerative joint disease of the lumbosacral spine. (*Id.*)

On June 29, 1997, Dr. George Kudirka, a non-examining government physician, determined that Plaintiff could lift less than ten pounds occasionally and could stand and/or walk for less than two hours in an eight hour day. (R. 231.) Dr. Kudirka based his determination on the medical evidence, including the positive Romberg test, the history of brain surgery, and the x-ray evidence of sclerosis of Plaintiff's lumbosacral spine. (R. 231-32.)

On August 9, 1994, at the request of Plaintiff's attorney, Frank Rowe, Ph.D. performed a psychological evaluation of Plaintiff, which included psychometric testing. (R. 251-256.) Dr. Rowe administered the Wechsler Adult Intelligence Scale - Revised (WAIS-R) which indicated that Plaintiff had a Verbal IQ score of 74, a Performance IQ score of 73 and a Full Scale IQ of 73. (R. 253.) Dr. Rowe, further, evaluated Plaintiff by using the Wide Range Achievement Test - Revised (WRAT-R), and determined that Plaintiff read at less than a third-grade level. (T. 251, 253.) Moreover, Plaintiff was only able to spell and complete arithmetic problems at about the third-grade level. (R. 253, 255.)

---

[4]The Romberg's test is used to differentiate between peripheral and cerebellar ataxia. *Dorlands*, at 1683.

Plaintiff's mental status examination and the Babcock-Levy-Story Recall Test showed a marked impairment in Plaintiff's short-term memory as applied to verbal materials. (R. 255.) The Bender-Gestalt and intelligence testing showed somewhat severe impairment of Plaintiff's visuoconstructive abilities. (R. 255.) Plaintiff also display signs of left-right confusion. (*Id.*)

Dr. Rowe diagnosed Plaintiff with organic mental syndrome "not otherwise specified" as well as borderline intellectual functioning. (R. 256.) In his report, Dr. Rowe indicated that Plaintiff met the requirements of Listing 12.02, which pertains to organic mental disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02 (2000). (*Id.*)

Dr. Rowe also assessed Plaintiff's mental abilities finding marked limitations in his ability to comprehend and carry out simple instructions, complete a normal workday, and perform routine tasks on a sustained basis. (R. 256-260.) Plaintiff, thus, had moderate limitations in several areas, including his ability to make simple, work-related decisions and perform routine tasks on a productive basis. (R. 259-61.)

From May 27, 1996 through May 29, 1996, Plaintiff was, again, hospitalized for dizziness. (R. 371-85.)

### A. Medical Expert Testimony

At the June, 1998 administrative hearing, Dr. Fred Fishman, the government's ME, was asked to testify regarding Plaintiff's condition as of September 30, 1991, the date his insured status expired. (R. 68.) Dr. Fishman testified that Plaintiff had a cerebellar hemangioma (cluster of blood vessels) in the back of his brain. (R. 76-77.) Dr. Fishman noted that such a cluster could affect one's balance. (R. 77.) Dr. Fishman testified that based on a reasonable inference from the medical evidence that Plaintiff's condition existed prior to September 30, 1991. (*Id.*) Dr.

Fishman also stated that Plaintiff had a back impairment (R. 78) and high blood pressure (R. 80).

The ALJ asked Dr. Fishman if he could determine whether any of Plaintiff's impairments or any combination of his impairments, met or equaled those of a listed impairment. (R. 80.) Dr. Fishman stated that it would be difficult to determine if Plaintiff's condition met or equaled a listed impairment, because there was no medical evidence covering the period between 1987 and 1992. (R. 81.) He indicated that the absence of such evidence "leaves a question about how severe [the impairments] were." (*Id.*) Dr. Fishman, however, stated that Plaintiff could have had symptoms as early as 1985 or as late as 1993. (*Id.*)

Dr. Fishman also pointed out that the medical evidence that was available was inconsistent because Plaintiff's complaints of dizziness covered different time periods. (R. 83, 85, 87.) For instance, in March, 1993, Plaintiff stated that he had been experiencing dizziness for seven years whereas in another medical record dated in 1993, Plaintiff complained that his dizziness had lasted for five years. (R. 85.) Moreover, Plaintiff also reported that he had been experiencing dizziness since 1990. (R. 87.) Thus, Dr. Fishman concluded that the only way that he could establish that Plaintiff's dizziness occurred prior to his date last insured was "by history only, not by examination." (*Id.*) Moreover, Dr. Fishman indicated that Plaintiff's brain condition could have been congenital. (*Id.*)

Dr. Fishman discussed Listings 11.02 through 11.05B with the ALJ and determined that is was possible that Plaintiff's impairments met or equaled Listing 11.05 (brain tumors) during the relevant time. (R. 90-91, 93.) 20 C.F.R. Pt. 404, Subpt. P, App. 1, § § 11.02 - 11.05B (2000). Dr. Fishman stated that the combination of Plaintiff's brain lesion and his chronic back problem could have met the equivalency test under Listing 11.05. (R. 90-91.) 20 C.F.R. Pt. 404, Subpt.

P, App. 1, § 11.05 (2000). The ALJ and Dr. Fishman eliminated the remaining listings because these called for sustained and continual problems, unlike Plaintiff's problem, which was intermittent. (R. 94.) The ALJ and Dr. Fishman also considered Listing 12.02 (organic mental disorders) or its equivalency and agree that it did not apply because it also required sustained and continual problems. (*Id.*) 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02 (2000). In addition, Dr. Fishman stated that he could not testify regarding Listing 12.02 because he was not qualified to testify about psychiatric conditions. (R. 98.)

Dr. Fishman testified that Plaintiff's statement regarding his activities were consistent with his alleged symptoms. (R. 88.) Plaintiff testified that he cooked and cleaned on a daily basis, and shopped for approximately two hours per week. (*Id.*) Dr. Fishman stated that because Plaintiff's condition was an intermittent rather than a continual problem, he could perform such activities. (R. 88-89.)

Dr. Fishman testified that, based on the medical record, Plaintiff probably could have performed sedentary work prior to September 30, 1991, his date last insured. (R. 93.) Thus, Dr. Fishman opined that Plaintiff retained a RFC for sedentary work which was restricted because Plaintiff could not work at heights and could not work around dangerous machinery. (R. 97-98, 102.)

### B. Vocational Expert Testimony

The VE testified that an individual of Plaintiff's age, education (average intelligence) and work experience, who could perform sedentary work (but who could not work at heights or around dangerous machinery), could work as a cashier in a parking lot, as a security monitor, or as an information clerk at an enclosed industrial site. (R. 99, 101.) The VE testified that there

were approximately 4,000 of these types of jobs. (R. 101.) The ALJ asked how many of these jobs existed in the local economy and how many existed in the general (journey) economy. (*Id.*) The VE stated that she was not looking at more than 1,500 jobs in each of these two categories. (R. 102.)

The VE also testified that an individual with an IQ of 73 could work as an assembler or packer. (R. 104.) The VE stated that in this region, there are approximately 800 assembler and 1,500 packing jobs. (R. 105.)

## III.   THE ALJ'S FINDINGS AND DECISION HEREIN.

The ALJ found that Plaintiff met the disability insured status requirements on January 1, 1990, the date Plaintiff stated he became unable to work, and that he continued to meet them through September 30, 1991. (R. 21.) The ALJ determined that Plaintiff had not engaged in any substantial gainful activity since 1987. (*Id.*) The medical evidence establishes that Plaintiff has severe status post lesion in the brain, cavernous hemangioma that had bled; status post fossa craniotomy and resection of the hemangioma; diffuse disc space narrowing and facet sclerosis of the lower lumbar spine, most marked at L3-4, L4-5 and L5-S1; and decreased intellectual functioning. (*Id.*) The ALJ determined, however, that Plaintiff does not have an impairment, or combination of impairments, listed in, or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4. (*Id.*)

Because the ALJ found that Plaintiff's impairments did not meet or equal a listed impairment, the ALJ, *inter alia*, assessed Plaintiff's RFC to determine what Plaintiff could do despite his limitations. After reviewing the testimony and medical records, the ALJ concluded that Plaintiff retained the RFC to perform "sedentary" work. *See* 20 C.F.R. § 404.1567; 416.967.

(R. 22.)  The ALJ determined that Plaintiff has the RFC to perform the physical exertion and

nonexertional requirements of sedentary work except that he cannot stand/or walk in excess of

two hours intermittently in an eight hour workday and he cannot lift more than ten pounds.  (*Id.*)

Plaintiff is also restricted in performing the full range of sedentary work because he must avoid

heights and/or dangerous moving machinery and equipment. (*Id.*)

The ALJ found that although Plaintiff's additional nonexertional limitations do not allow

him to perform the full range of sedentary work, there are still a significant number of jobs in the

national economy which he can perform.  (R. 22.)   The types of jobs that Plaintiff can perform

include cashier, security monitor, information clerk in an enclosed area, and assembler. (*Id.*)

Therefore, the ALJ concluded that Plaintiff was not disabled and that when considering

Plaintiff's RFC, age, education and work experience, he was capable of performing other

qualifying work. (R. 22-23.)

## ANALYSIS

Plaintiff's threshold argument is that the ALJ's July 16, 1998 determination that he is not

disabled is not supported by "substantial evidence."  Plaintiff's seeks reverse or remand of the

ALJ's decision finding that Plaintiff is not disabled as of September 30, 1991, the date his

insured status expired. (*See generally*, Pl.'s Briefs.)

Upon review of the record, the court finds that there exists substantial evidence to support

the ALJ's decision.  As it relates to remand, Plaintiff appears to allege, *inter alia*, that (1) the

ALJ applied an age category mechanically in a borderline situation in violation of 20 C.F.R. §

404.1563(a), (2) the ALJ's decision cannot be reviewed because he did not provide the incident

of jobs in the relevant region in which Plaintiff lived, (3)  the ALJ did not explain how Plaintiff's

intelligence diminished (changed) between 1982 and 1994, (4) the ALJ misrepresented the state physician's (Dr. Fishman) testimony by erroneously evaluating evidence of Plaintiff's organic mental syndrome, (5) the ALJ did not explain why Plaintiff had a third-grade education in 1994, but possessed a higher level of education in 1982, and (6) the ALJ misrepresented the report of a non-examining state agency physician, Dr. George Kudirka. (*See generally*, Pl.'s Briefs.)

## I. BORDERLINE REGULATION

Plaintiff first argues that in violation of 20 C.F.R § 404.1563(a), the ALJ mechanically applied the Medical-Vocational Guidelines or Grid Rules, to find him disabled. Pl.s Reply at 11. Plaintiff, thus, contends that the ALJ failed to consider the fact the he was 49 years, seven and one-half months old (only a few months shy of his 50 birthday) as of September 30, 1991, the date his insured status expired. *Id.* Had the ALJ applied the next higher age category, Plaintiff asserts that he would have been found to be disabled. *Id.* Thus, Plaintiff argues that the ALJ erroneously determined that he was not disabled because the ALJ failed to apply the borderline regulation in his situation where he was close to fifty years old at the time his insured status expired. *Id.*

Defendant, on the other hand, argues that Plaintiff has not asserted why he should have been considered to be fifty years old, at the time his insured status expired, when, in fact, he was only 49 years old. Def.'s Br. at 14. Defendant, further, alleges that because the ALJ relied on the Grid Rules (Grid Rule 201.18) in conjunction with the VE's testimony, that the ALJ did not apply the Grid Rules mechanically. *Id.*

Under 20 C.F.R. § 404.1563(a), the Commissioner 'will not apply . . . age categories "mechanically in borderline cases."' *Heckler v. Campbell*, 461 U.S. 458, 462, 103 S.Ct. 1952, 76

L.Ed.2d 66 (1983); *Tousignant v. Apfel*, 1998 WL 142415, at *5 (N.D. Ill. March 26, 1998). *See also Daniels v. Apfel*, 154 F.3d 1129, 1134 (10th Cir. 1998) (applying the borderline regulation to claimant's date that he was last insured.) Accordingly, a "borderline situation" exists, and the "borderline" regulation (20 C.F.R. § 404.1563(a)) comes into play, "when there would be a shift in results caused by the passage of a few days or months." *See* Social Security Ruling 82-46C; *Hawkins v. Apfel*, 1998 WL 378421, at 1 (N.D. Ill. July 1, 1998).

The court finds that the ALJ improperly failed to apply the Commissioner's borderline regulation pursuant to 20 C.F.R. § 404.1563(a). There is no evidence or indication in the record that the ALJ ever considered the borderline regulation as applied to Plaintiff. *See generally, Godbey v. Apfel*, 238 F.3d 803 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2000). Moreover, while Defendant asserts that it is Plaintiff's burden to articulate why the borderline regulation should be applied in his case, there is nothing in the law that supports Defendant's position. *Daniels*, 154 F.3d at 1134. Rather, the borderline regulation places the burden on the Commissioner to determine what age category should be applied. *Id.* Furthermore, Defendant's allegation that the ALJ did not apply the Grid Rules mechanically because the ALJ relied on the testimony of the VE, is unavailing because Defendant cites no legal authority for its proposition.

The court, therefore, remands the cause for application of the Commissioner's borderline regulation.

## II.    RELEVANT REGION

Plaintiff alleges that the ALJ's decision is unreviewable because the ALJ did not provide the incident of jobs in the relevant region in which Plaintiff lives. Pl.'s Br. at 9. Plaintiff asserts that the ALJ was required, under SSR 83-14, to provide "a statement of the incidence of such

15

work in the region in which the individual resides or in several regions of the county." SSR 83-14. Plaintiff also relies on *Lee v. Sullivan*, 998 F.2d 789, 792 (7th Cir. 1993) (vocational expert testified that there were approximately 1,400 positions in "the greater Milwaukee metropolitan area which has a work force of 750,000"). Defendant, on the other hand, asserts that the ALJ did provide an appropriate breakdown of the jobs in both the national and local (journey) economies. Def.'s Br. at 8-9.

At the administrative hearing, the VE testified that there were approximately 4,000 jobs (cashier in a parking lot, security monitor, and information clerk in an enclosed industrial site) that the Plaintiff could perform (assuming an individual with average intelligence). (R. 101.) The ALJ asked the VE how many of these jobs existed in the local economy and how many existed in the general (journey) economy. (R. 101.) Specifically, the ALJ asked the VE to break down the number of cashier jobs "in this economy and the journey economy." (R. 101.) The VE stated that she was not looking at more than 1,500 jobs in each of these two categories. (R. 102.) The VE also testified that an individual with an IQ of 73 could work as an assembler or packer. (R. 104.) The VE stated that in this region, there are approximately 800 assembler and 1,500 packing jobs. (R. 105.)

The court finds that the ALJ meet its burden under SSR 83-14 because the VE provided a breakdown of the number of jobs that Plaintiff was capable of performing in both the local and national economies. Therefore, the court finds that when the VE is referring to jobs "in this economy" or "this region" that she is implicitly referring to those jobs to the Chicago area, where Plaintiff resides. Therefore, as the VE identified jobs in the Chicago region that Plaintiff could perform, Plaintiff's argument is unavailing.

## III.    PLAINTIFF'S INTELLIGENCE QUOTIENT

Plaintiff asserts that the ALJ does not explain why Plaintiff's intelligence quotient ("IQ") diminished (or changed) between 1982 and 1994.  Pl.'s Reply at 6.  Plaintiff argues that his IQ testing in 1994 which resulted in a full scale IQ score of 73 relates back in time because IQ scores "measure innate characteristics." *Guzman v. Bowen,* 801 F.2d 273, 275 (7th Cir. 1986).  Plaintiff, thus, alleges that the ALJ should have presumed that his IQ score was 73 on September 30, 1991, the date his insured status expired.  In addition, Plaintiff alleges that the ALJ does not explain how he knows that Plaintiff's intelligence diminished significantly only after September 30, 1991. *Id.*

Defendant, on the other hand, argues that it relied on the VE's testimony that Plaintiff had average intelligence (an eighth or ninth grade education) because he had performed semi-skilled jobs.  Def.'s Br. at 10.  For instance, the VE testified that Plaintiff had been a diesel engine tester which required that Plaintiff possess some ability to read and write as well as "at least average intelligence." *Id.*  Thus, Defendant, asserts that the ALJ simply had two conflicting pieces of evidence (i.e., Plaintiff's 73 IQ and his prior work history) and determined that a finding of average intelligence was reasonable based on the VE's testimony regarding Plaintiff's prior jobs. *Id.* at 11.

The court finds that Plaintiff's argument that the ALJ did not explain why Plaintiff's intelligence diminished between 1982 and 1994, and that his intelligence diminished after 1991, is correct, but not pertinent.  The argument is not pertinent because the VE identified jobs in both the national and local economy for an individual, such as Plaintiff, who possessed either average intelligence or below average intelligence (i.e., an IQ of 73).  (R. 99-107.)  Because the VE

17

already identified applicable jobs that Plaintiff can perform in the local economy, assuming an IQ of 73, a remand instructing the ALJ to provide an explanation for Plaintiff's diminished mental capacity, would be of no avail to Plaintiff and, respectfully, is not warranted.[5]

## IV. ORGANIC MENTAL SYNDROME

Plaintiff asserts that the ALJ misrepresented the state physician's (Dr. Fishman) testimony and that the ALJ erroneously evaluated evidence of Plaintiff's organic mental syndrome. Pl.'s Br. at 11.

In the ALJ's summary and evaluation of evidence, the ALJ stated that Dr. Fishman "testified that he saw no evidence in the record to support an assessment under Listing[] . . .12.02 [organic mental syndrome]." R. 19. At the administrative hearing, the ALJ asked Dr. Fishman, "[W]e're ruling out 1102[sic]?" R. 95. Dr. Fishman responded, "Organic, organic mental disorder, no." R. 95. However, on cross-examination, Dr. Fishman was asked, "You discussed 12.02." Did you review the psychological report –[?]" R. 98. Dr. Fishman responded, "I'm not qualified." R. 98. Dr. Fishman was again asked about Dr. Rowe's report to which Dr. Fishman

---

[5]Similarly, Plaintiff, appears to be alleging that the ALJ did not explain why Plaintiff performed at the third-grade level in 1994, but supposedly had average intelligence in 1982, indicating Plaintiff had a higher academic level than the third grade level. Pl.'s Reply at 8-9. Dr. Rowe found that Plaintiff had an IQ of 73 and performed at the third grade level (i.e., Plaintiff read, spelled and did math at about the third-grade level), but the VE, as stated, found Plaintiff even at these levels could perform a lot of jobs. (R. 99-107.)

Again, while Plaintiff's assertion that the ALJ did not explain why Plaintiff's intelligence level may have changed between 1982 and 1994 is correct, it is not pertinent. It is not pertinent because the VE identified jobs in both the national and local economy for an individual, such as Plaintiff, who possessed either average intelligence or below average intelligence (i.e., an individual with an IQ of 73) and performed at a third-grade level. Therefore, Plaintiff's remand argument is unavailing because instructing the ALJ to provide an explanation for Plaintiff's alleged diminished capacity would be of no aid to Plaintiff. The Commissioner's determination was supported by substantial evidence because there are identified jobs in the local economy Plaintiff can perform, even with an IQ of 73 and third-grade performance level.

responded, "As I say, I'm not a psychiatrist. I can't testify to psychiatric problems. There may or may not be." R. 98. Plaintiff, thus, argues that the ALJ misrepresented Dr. Fishman's testimony when the ALJ stated that Dr. Fishman testified that he saw no evidence that Plaintiff impairments met Listing 12.02. Pl.'s Reply at 7-8.

Defendant, in response, argues that Dr. Rowe diagnosed organic mental syndrome and opined that the deficits Plaintiff suffered from occurred as a result of either impairments of cerebral circulation and/or damage incurred during his 1993 surgery to correct the circulation impairments. Def.'s Br. at 11. Defendant asserts if Plaintiff's organic mental syndrome is a result of cerebral circulation impairments then Plaintiff must prove this fact. *Id.* Therefore, Plaintiff must prove that he was disabled as of September 30, 1991 and the court finds Plaintiff has not carried his burden to do so as required at step 3. *See Knight v. Chater,* 55 F.3d 309, 313 (7th Cir. 1995) (the burden of proof is on claimant through step four; only at step five does the burden shift to the Commissioner.)

Put differently, Plaintiff's argument that the ALJ erroneously stated Dr. Fishman's testimony is correct. However, it not relevant. In short, Plaintiff, respectfully, has not carried his burden of proof as to step 3. Plaintiff has not argued and has presented no evidence that he had organic mental syndrome (e.g., due to cerebral circulatory impairments) on or prior to September 30, 1991. Accordingly, Plaintiff's organic mental syndrome contention cannot prevail.

## VI.    DR. KUDIRKA'S REPORT

Plaintiff alleges also that the ALJ, in his summary and evaluation of evidence, misrepresented Dr. Kudirka's report. Pl.'s Reply at 10-11. Respectfully, even if Plaintiff is correct, it is not really discernible from the arguments or the record if the perceived error had any

impact on the findings of the ALJ. In view of our remand order, however, it is not necessary to consider this Kudirka report issue further herein. This is without prejudice for Plaintiff to point out and argue, and for Defendant to contest, the report misstatement issue and any implications thereof before the ALJ on remand.

## CONCLUSION

In view of the foregoing, the court grants Plaintiff's motion for summary judgment insofar as it requests a remand and denies Defendant's cross-motion for summary judgment. Accordingly, the cause is remanded to the Commissioner for further proceedings consistent with this opinion.

**ENTER:**

**IAN H. LEVIN**
**United States Magistrate Judge**

Dated: May 9, 2001